JOSEPH D. GETTO, Beneficiary of Standard Bank and Trust No. 16091, Plaintiff and Counterdefendant-Appellee and Cross-Appellant, v. THE CITY OF CHICAGO, Defendant and Counterplaintiff-Appellant and Cross-Appellee.

First District (1st Division)    No. 1—07—0673

Opinion filed June 1, 2009.

GORDON, ROBERT E., J., dissenting.

Mara S. Georges, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Suzanne M. Loose, Assistant Corporation Counsel, of counsel), for appellant.

William B. Kohn, of Law Offices of William B. Kohn, of Chicago, for appellee.

JUSTICE GARCIA delivered the opinion of the court:

We originally issued our decision as an unpublished order under Supreme Court Rule 23 (166 Ill. 2d R. 23). The City of Chicago (the City) filed a petition for rehearing. Joseph Getto also filed a petition for rehearing, even though he filed no brief on appeal. We granted both, withdrew our Rule 23 decision, and now file this opinion in light of the additional filings by both sides.

This action first arose from a filing by Mr. Getto seeking to prevent the City from terminating water service to his property while he disputed a $120,019.49 water bill. Mr. Getto later amended his complaint, seeking a judicial declaration that he did not have to pay the bill. Following a bench trial, the trial court enjoined the collection of the $120,019.49 water bill.[1]

The City contends the trial court "ignored the requirements of the Chicago Municipal Code" when it enjoined collection of the water bill because no evidence was presented at trial that the water meter was registering incorrectly or had stopped registering. The City asks that we reverse the judgment of the circuit court, enter judgment in its favor on its counterclaim, and remand this cause for any further relief the City is entitled to under the Municipal Code. We agree with the City; we reverse and remand.

---

[1] In the caption Mr. Getto is identified as cross-appellant based on his improperly filed notice of cross-appeal. See *City of Evanston v. Regional Transportation Authority*, 209 Ill. App. 3d 447, 456-57, 568 N.E.2d 244 (1991) (cross-appeal not proper from judgment that was not adverse).

## BACKGROUND

Joseph Getto is the beneficiary of a trust that owns a 14-unit building on West Marquette Road in Chicago (the Marquette building). On July 2, 2003, Mr. Getto filed a complaint for injunctive relief seeking to prevent the City from terminating water service to the Marquette building while Mr. Getto disputed a $120,019.49 water bill. He later amended the complaint to seek a judicial declaration that he was not liable for the amount billed. The matter proceeded to a bench trial in September 2006.

Mr. Getto testified that he owned multiple residential buildings managed through his company, Park Management. While Mr. Getto oversaw the maintenance and capital improvements of the buildings, he was not directly involved with the routine upkeep of the properties. A team of three employees was responsible for day-to-day maintenance and Mr. Getto was only consulted when they needed approval for a "major repair."

Mr. Getto purchased the Marquette building in 1993. The building had 10 studio apartments and 4 one-bedroom apartments. Each unit had a kitchen sink, a bathroom sink, a toilet, and a tub. The building was surrounded by a locked five-foot-tall wrought iron fence. Mr. Getto generally visited the Marquette building every three to four weeks in the summer and up to six times a month in the winter. Although Mr. Getto sometimes went into the basement, he never checked the water meter.

Because the Marquette building was surrounded by a locked fence, Mr. Getto and his staff made appointments with the electric and gas companies when the electric and gas meters needed to be read. The water department meter readers, on the other hand, usually called from the Marquette building asking for immediate access to the meter. Mr. Getto and his staff could not always accommodate these requests.

In August 2002, the water department made arrangements to read the meters in several of Mr. Getto's buildings that had been receiving estimated bills. The water department then arranged to reread the Marquette building's water meter.

When Mr. Getto received a water bill for $120,019.49, he thought the amount was a mistake and called the water department to request a review of the bill. Mr. Getto had successfully contested a large water bill for another building in the past.

In December 2002, the water department removed the water meter from the Marquette building and installed a new meter with a remote reading device. After the new meter was installed, the building's water bills were based on actual water usage.

During cross-examination, Mr. Getto was questioned regarding plumbing problems at the Marquette building. These problems included (1) a broken outside faucet, (2) a tub faucet that could not be turned off, (3) a leaking bathtub, (4) leaking bathroom pipes, (5) "water bugs," (6) leaking radiators, and (7) running toilets. Tenants also complained about wet, "swollen," and moldy walls. Mr. Getto did not remember the majority of these plumbing problems and did not know when many of the problems were fixed. Although workmen reported seeing clamped pipes in the basement, Mr. Getto denied there were leaking pipes in the basement.

The parties stipulated that water department rate takers Leslie Travis and Nancy Smith would testify that because of a locked fence at the Marquette building they were unable to read the water meter between May 1995 and July 2002. The parties also stipulated that the water bills issued between May 1995 and June 2002 were based on estimated readings of the water meter.

The City presented the testimony of Leonard Caifano, a supervisor of water meter assessors. Mr. Caifano testified that a water rate taker notes the reading on the meter, the condition of the building, "whether the meter is operating," and "any illegal connections or improper things related to the water meter, its operation and accessibility."

Sonyia Henry, supervisor of customer accounts at the water department, testified that she ensures the readings provided by rate takers are uploaded into the billing system and that bills are mailed to customers. A bill indicates on its face when it is based on an estimated reading of the meter. Estimated readings are based on prior usage. Ms. Henry testified the Marquette building's estimated bills were based on the building's prior usage and were issued approximately every two months.

On April 11, 1995, the actual reading on the Marquette building's water meter was 1856. On August 27, 2002, the actual reading on the meter was 365. The building's water usage between the two actual readings was calculated at 7,271,000 cubic feet (7.27 million cubic feet).

Jim Hjelmgren, a water meter machinist, testified he went to the Marquette building to examine the water meter on December 5, 2002. During his examination, the meter registered 393.54, its installation seals were intact, and it was not leaking. Mr. Hjelmgren returned the next day to replace the meter. The meter registered 393.9 when it was removed. Mr. Hjelmgren installed a new meter with a remote reading device and took the old meter to a water department facility for testing.

Michael Duda, a water rate takers supervisor, testified that when he read the Marquette building's water meter on August 7, 2002, it

registered 360.70. On August 27, 2007, when he reread the meter it registered at 365.76.

George Galen, a water meter machinist, testified he tested the water meter removed from the Marquette building on December 9, 2002. Mr. Galen performed two tests on the meter, a high flow test and a low flow test. For the high flow test, Mr. Galen placed the meter in a testing device, determined there were no leaks, and purged the air from the system. He then let water from a tank holding 10 cubic feet of water flow through the meter at a rate of 50 gallons per minute. Based on the results of this test, Mr. Galen determined the meter's accuracy was 100%. Mr. Galen next performed a low flow test in which the water flowed though the meter at eight gallons per minute. Based on this test, the accuracy of the meter was 100.5%.

In rebuttal, Mr. Getto presented the testimony of structural engineer Michael Allen. Mr. Allen calculated the average monthly water consumption at the Marquette building as 11,000 cubic feet. This figure was based on the assumption that each unit in the building was occupied and that the average daily water usage per person was 100 gallons. Mr. Allen then "performed some basic hydraulic calculations to look at different scenarios as to how the water, the volume of water in question could pass through the pipes." He also made a physical inspection of the building in order to look for "signs of *** massive water damage." He did not find any visible signs of water damage in the basement or the two apartments he inspected.

In Mr. Allen's opinion, in order for the Marquette building to have consumed 7.27 million cubic feet of water over the period in question, a "catastrophic event" would have had to occur. Examples of a "catastrophic event" included a broken water main, six faucets running constantly for nine years, and five tub or shower fixtures running constantly for seven years. Although it was physically possible for the Marquette building to have consumed 7.27 million cubic feet of water, in Mr. Allen's opinion it was not "reasonable or probable that [7.27 million cubic feet of water] could have been consumed without some evidence" of a catastrophic event.

During cross-examination, Mr. Allen admitted that he did not inspect every apartment in the Marquette building for water damage and that he did not measure the building's flow rate. Rather, Mr. Allen based his calculations on the flow rate of the faucets at his home in Lisle and on published data from the Environmental Protection Agency.

The City presented the testimony of Victor Smith, a mechanical engineer, to rebut Mr. Allen's testimony. In Mr. Smith's opinion, the Marquette building could have consumed 7.27 million cubic feet of

water through "a combination of scores of small events" rather than one catastrophic plumbing event.

The trial court determined there was "sufficient evidence in this record that indicates that there was an excessive amount of water read on that meter, but no basis for an understanding of how that might have occurred," which "in and of itself" shifted the burden of explanation to the City. The trial court ruled in Mr. Getto's favor because, in the court's words, "the city cannot explain why that amount of excessive water would have been read on that meter assuming that the meter, although it was tested, was accurate." The court commented that the City cannot use its failure to read the water meter "as an excuse for coming up with a bill that is thousands of times greater than the normal average." This timely appeal followed.

## ANALYSIS

The City contends the trial court "ignored" the Chicago Municipal Code when it ruled for Mr. Getto because under the Municipal Code a customer is liable for the amount of water registered by a water meter except when the meter is registering incorrectly or has stopped registering. The City further contends that because all evidence presented at trial indicated the meter was registering correctly, Mr. Getto was "liable for the full amount of water registered by the meter."

As we stated, Mr. Getto did not file a brief on appeal. He has filed a petition for rehearing, an answer to the City's petition for rehearing, and a reply to the City's answer to his petition. In our Rule 23 decision, we cited to *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493 (1976), for the proposition that we could address the merits of the City's appeal because "the record is simple and the claimed errors are such that [we] can easily decide them without the aid of an appellee's brief." In its answer to Mr. Getto's petition for rehearing, the City asserts that Mr. Getto "has waived all of his arguments because he did not file a brief." See 210 Ill. 2d R. 341(i) (brief for appellee shall comply with rules for brief of appellant); 210 Ill. 2d R. 341(h)(7) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); *People v. Exson*, 384 Ill. App. 3d 794, 803, 896 N.E.2d 844 (2008) ("Rule 341(i) [citation] applies Rule 341(h)(7) to appellee brief"). We agree. We consider the claims Mr. Getto raises in his petition for rehearing only as to points we may have "overlooked or misapprehended" in our initial decision, while keeping in mind that "[r]eargument of the case shall not be made in the petition." 210 Ill. 2d R. 367(b).

The Municipal Code addresses the manner in which the City charges for water:

"City water supplied *** through service pipes controlled by water meter shall be charged and paid for on the basis of the amount registered by such meter, except in cases where it shall be found that such meter is registering incorrectly, or has stopped registering." Chicago Municipal Code §11—12—320 (December 4, 2002).

The Municipal Code also excludes claims for deductions or rebates for water measured, but not used by a customer:

"No deduction shall be made or rebate allowed to any consumer of water under meter control by or on account of any leakage or alleged leakage in any water pipe, tank or other apparatus or device. The amount of water registered by any meter controlling the water supply to any building, structure or premises, shall be charged and paid for in full, irrespective of whether such water, after having been registered, was lost by leakage, accident or otherwise ***." Chicago Municipal Code §11—12—460 (December 4, 2002).

Municipal ordinances are construed no differently than statutes. *Daley v. American Drug Stores*, 312 Ill. App. 3d 1133, 1135, 728 N.E.2d 725 (2000). The construction of an ordinance presents a question of law, subject to *de novo* review. *MD Electrical Contractors, Inc. v. Abrams*, 228 Ill. 2d 281, 286, 888 N.E.2d 54 (2008). Our goal when construing an ordinance is to ascertain and give effect to the drafter's intent. *Daley*, 312 Ill. App. 3d at 1135-36. The "simplest" way to reach this goal is to give the words in the ordinance their plain and ordinary meaning. *MD Electrical Contractors*, 228 Ill. 2d at 287. When the language is clear and unambiguous, we apply the ordinance as written. *MD Electrical Contractors*, 228 Ill. 2d at 287-88. Once construed, the terms are applied to the facts of a particular case to determine the outcome under the ordinance. See *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 235, 848 N.E.2d 1 (2005).

The clear and unambiguous language of section 11—12—320 of the Municipal Code requires a customer to pay for the water registered by his water meter except when the water meter is registering incorrectly or has stopped registering. Accordingly, under the Municipal Code, whether Mr. Getto could avoid liability for the $120,019.49 water bill turned on the accuracy of the Marquette building's water meter.

Based on our review of the record, Mr. Getto did not directly challenge the meter's accuracy or question the reliability of the tests performed upon the meter to establish its accuracy. Rather, Mr. Getto's challenge, made through his expert, was circumstantial: "[It was

not] reasonable or probable that [7.27 million cubic feet of water] could have been consumed without some evidence [of a catastrophic event]." Absent evidence of a catastrophic event, Mr. Getto concluded the reading on the meter was simply wrong.

The City, on the other hand, presented the results of two tests of the water meter which indicated the meter was registering at 100%. To further support its position that the meter accurately registered the amount of water supplied to the building, the City cross-examined Mr. Getto regarding the building's numerous plumbing problems and presented its own expert that the building could have consumed the large amount of water through numerous small plumbing problems rather than by way of a catastrophic event.

The trial court ruled for Mr. Getto based on the City's inability to adequately explain how the water meter registered 7.27 million cubic feet of water. While we understand the trial court's frustration with the parties' efforts to blame each other for the gap of 7½ years between actual readings of the water meter, we are aware of no authority that holds such a delay between actual readings gives rise to a legal obligation on the part of the City to explain how the Marquette building consumed 7.27 million cubic feet of water. The trial court's judgment entered in favor of Mr. Getto was based on its determination that the City bore the burden of explaining the amount of water registered by the meter, even "assuming that the meter *** was accurate," as the trial court noted, and the City's failure to do so excused Mr. Getto from paying the $120,019.49 bill. The trial court cited *Tepper v. County of Lake*, 233 Ill. App. 3d 80, 598 N.E.2d 361 (1992), as authority that the burden shifted to the City to explain the large amount of water usage registered by the meter. *Tepper* is a case where the trial ended with a "granting [of] a directed finding in plaintiff's declaratory judgment action." *Tepper*, 233 Ill. App. 3d at 81. The plaintiff appealed, and the appellate court agreed that "he presented a *prima facie* case that *** a bill for water service [was sent] based on an inaccurate water meter." *Tepper*, 233 Ill. App. 3d at 81. Accordingly, the trial court's entry of the directed finding was error. *Tepper*, 233 Ill. App. 3d at 87. No similar contention involving a *prima facie* case can be made here. A full bench trial was conducted, the only focus of which was the accuracy of the water meter; the burden of proof never shifted. See *Morrison v. Flowers*, 308 Ill. 189, 195, 139 N.E. 10 (1923) (*prima facie* "rule does not change the burden of proof, for when all the evidence introduced in the case is submitted the case is to be determined upon the whole evidence").

We are aware of no requirement in the Municipal Code that the City must explain an "excessive" amount of water registered by a

meter. Rather, section 11—12—320 of the Municipal Code requires that a customer pay for all water registered by meter except when the meter is found to be registering inaccurately or has stopped registering. Additionally, section 11—12—460 permits no reduction to a water bill where the water meter accurately measures the flow of water even though the water is lost through a leak or accident. Here, because the evidence presented at trial conclusively established that the meter was registering correctly, Mr. Getto cannot escape liability for the amount of water registered by the meter.

We briefly address the evidence presented at the bench trial to demonstrate Mr. Getto's claim that the final meter reading was wrong is unpersuasive. The Marquette building's water bill for the actual reading of April 11, 1995, was for $1,378.26. For the next 37 billing periods, Mr. Getto was billed based on estimated readings. No actual reading of the water meter was performed again until August 7, 2002. During those 7½ years, the Marquette building's water bills varied greatly. Between August 28, 1995, and October 20, 1999, the estimated bills ranged from $13.19 to $601.28. The bill dated December 20, 1999, was for $1,161.30. The bill dated June 16, 2000, was for $326.67. The next bill, dated August 18, 2000, was for $610.49. Thereafter, the building was billed around $770 every two months for its water usage. The actual reading of the meter for the period ending August 27, 2002, resulted in the bill for $120,019.49.[2]

The $120,019.49 bill averaged over the 37 billing periods of estimated readings is an additional $1,333.55 per month.[3] This average increase would have raised the first estimated bill Mr. Getto received in August 1995 of $13.19 to $1,346.74, an amount less than the bill he received for April 1995 of $1,378.26, based on an actual reading. Upon seeing a drop of more than $1,300 from an actual-reading billing period to an estimated-reading billing period, we question how Mr. Getto could not have realized there was a discrepancy between the building's actual water usage and the estimated bills he received. Looking at the amounts billed over the estimated-readings period, we do not believe that the $120,019.49 water bill Mr. Getto received was outside reasonable bounds, such that only a "catastrophic event" could explain it.

---

[2]Mr. Getto's records indicate the bill was $118,347.15, which reflects a discount of $1,672.34 if full payment was received by September 20, 2002.

[3]We do not consider any increase in the water usage charge by the City that may have occurred over the 7½-year period, which would undermine further Mr. Getto's claim.

In accordance with the clear and unambiguous language of the Municipal Code, we hold a customer must pay for the water registered by a water meter except when the meter is shown not to be registering accurately or not registering at all. Here, the evidence conclusively established that the water meter for the Marquette building registered at 100% accuracy. Accordingly, Mr. Getto is liable for the water supply registered by his meter and the trial court erred when it concluded otherwise.

## CONCLUSION

We reverse the order of the circuit court enjoining the city from collecting the August 2002 water bill of $120,019.49. We remand to the circuit court with directions that judgment be entered on the City's counterclaim and that the City be granted any additional relief it may be entitled to under the Municipal Code.

Reversed and remanded.

WOLFSON, J., concurs.

JUSTICE ROBERT E. GORDON, dissenting:
I respectfully dissent.

This court has repeatedly held that a reviewing court will not substitute its judgment for that of the trial court in a bench trial, unless the trial court's judgment is against the manifest weight of the evidence. *First Baptist Church of Lombard v. Toll Highway Authority*, 301 Ill. App. 3d 533, 542 (1998); *Chicago Pizza, Inc. v. Chicago's Pizza Franchise Limited USA*, 384 Ill. App 3d 849, 859 (2008), citing *Dargis v. Paradise Park, Inc.*, 354 Ill. App. 3d 171, 177 (2004). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001).

The trial judge is in a superior position to judge the credibility of the witnesses and to determine the weight to be given their testimony. *Buckner v. Causey*, 311 Ill. App. 3d 139, 144 (1999). When a bench trial contains contradictory testimony that could support conflicting conclusions, an appellate court will not disturb the trial court's factual findings, unless a contrary finding is clearly apparent. *Buckner*, 311 Ill. App. 3d at 144.

In the case at bar, the majority concludes on page 11 of its slip opinion (392 Ill. App. 3d at 238) that "[b]ased on our review of the record, Mr. Getto did not directly challenge the meter's accuracy." I disagree.

Estimated water reads are based on prior usage. When Getto received a $120,019.49 water bill, far above what the previous usage had been, he knew something was wrong, and he called the water department and requested a review. Getto's expert opined that it was not " 'reasonable or probable' " (392 Ill. App. 3d at 236) that 7.27 million cubic feet of water could have been consumed without some sort of "catastrophic event" that would have been noticed by someone. Getto's expert explained that "that volume of water would fill the building in question 52 times from basement to roof." To provide an example of a catastrophic event, Getto's expert stated that, if a water main broke and were allowed to flow unrestricted for 24 hours a day, 7 days a week, it would take "a couple of months" to deliver the volume of water at issue. Getto's expert observed that "74 million gallons of water is not going to happen through a toilet leak in this period of time."

Yet there was no evidence of a catastrophic event. Getto's expert testified that he saw "no signs of anything to indicate that any sort of rupture of the magnitude that would have been required for that amount of water to enter the building."

Getto's expert earned his degree in civil engineering from Northwestern University and worked for several companies, including 11 years for Commonwealth Edison. During the Chicago flood of 1992, the president of the Board of Trade asked the president of Commonwealth Edison to send an engineer to cope with the flooding in their building. The Commonwealth Edison president selected Getto's expert, who calculated the water flow, devised a method to stem it, and kept the Board of Trade operational during the emergency.

The City's expert admitted that he had never inspected the property. Therefore, all of the City's expert testimony was given without ever having been at the property. Although the City's expert opined that "it was possible" for the building to have consumed 7.27 million cubic feet of water through " 'a combination of *scores* of small events' " (emphasis added) (392 Ill. App. 3d at 237) there was no evidence of "scores" of events in the building. As an example of a "combination of scores of small events," the City's expert stated that there were "60 fixtures and pipes and hose bibs" in the building, and *this volume of water could have been consumed if there was leakage "in each and every one of those."* (Emphasis added.) Yet, the City's expert never went to the premises to see if there was any evidence of these "events." Based on that, the trial court could reasonably infer that the City knew that there was no evidence of "scores of small events" in the building.

I agree with the majority that, under the ordinance, liability turned on evidence of the water meter's accuracy. I disagree with the majority that "the evidence presented at trial conclusively established that the meter was registering correctly." 392 Ill. App. 3d at 240. The city's machinist opined that water meter tests indicated the meter was registering at 100%, but the testimony of both experts that 7.27 million cubic feet of water usage could not occur without a catastrophic event—or "scores" of small catastrophes—is much more compelling. As noted, there was no evidence of either a catastrophe, or scores of small catastrophes; therefore, the trial court could have reasonably found that the water meter was defective. The trial court stated that it ruled for Getto based on the City's inability to explain how the water meter registered 7.27 million cubic feet of water. This is the same as ruling that the evidence proved that the meter was defective. I agree with the majority that there is no requirement in the Municipal Code that the City explain the amount of water registered by a meter or explain what happens to water once it has been registered by a meter. However, the Municipal Code does not control the rules of evidence, and we presume the trial court took all the evidence into consideration in rendering its decision.

In this case, I cannot say that the trial court's decision is against the manifest weight of the evidence. Surely, the opposite conclusion is not apparent (*Buckner*, 311 Ill. App. 3d at 144), and the trial court's findings do not "appear to be unreasonable, arbitrary, or not based on evidence" (*Judgment Services*, 321 Ill. App. 3d at 154). I would affirm the trial court.