# Illinois Official Reports

## Appellate Court

*Amalgamated Transit Union, Local 241 v. Illinois Labor Relations Board, Local Panel*,
2017 IL App (1st) 160999

| | |
|---|---|
| Appellate Court Caption | AMALGAMATED TRANSIT UNION, LOCAL 241, Petitioner, v. THE ILLINOIS LABOR RELATIONS BOARD, LOCAL PANEL and THE CHICAGO TRANSIT AUTHORITY, Respondents. |
| District & No. | First District, First Division<br>Docket No. 1-16-0999 |
| Filed | August 21, 2017 |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, Local Panel, No. L-CA-14-022. |
| Judgment | Set aside and remanded. |
| Counsel on Appeal | Jacobs, Burns, Orlove & Hernandez, of Chicago (Sherrie E. Voyles and Taylor E. Muzzy, of counsel), for petitioner.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and John P. Schmidt, Assistant Attorney General, of counsel), for respondent Illinois Labor Relations Board, Local Panel.<br><br>Karen G. Seimetz, Corporation Counsel, of Chicago (Stephen Wood and Rachel Kaplan, Assistant Corporation Counsel, of counsel), for other respondent. |

JUSTICE MIKVA delivered the judgment of the court, with opinion. Presiding Justice Connors and Justice Harris concurred in the judgment and opinion.


**OPINION**

¶ 1     The Amalgamated Transit Union, Local 241 (Union), brought an unfair labor practice charge against the Chicago Transit Authority (CTA) for violating the parties' collective bargaining agreement and failing to bargain with the Union when the CTA implemented an open fare payment collection system, known as Ventra. The Ventra contract resulted in the CTA eliminating Union positions and subcontracting what had been Union jobs to a private company. The Illinois Labor Relations Board (Board) dismissed the unfair labor practice complaint as it pertained to the subcontracting of Union jobs as untimely because the charge was not filed within six months of the date that the Union received a copy of a request for proposals (RFP) for Ventra from the CTA. The Board then dismissed the rest of the complaint because it determined that the elimination of Union positions was not a mandatory subject of bargaining. The Union appealed the Board's decision to this court directly.

¶ 2     In our original decision, issued on March 27, 2017, we rejected the Board's finding that the subcontracting charge was untimely. We held that the Union's charge as to subcontracting was timely filed and remanded to the Board for further consideration of the merits of that charge, as well as reconsideration of the charge on the elimination of Union positions.

¶ 3     On August 9, 2017, we granted petitions for rehearing filed by the CTA and the Board. On reconsideration of the issues in this case, we realize that our initial decision overlooked the possibility that the Union's charge on subcontracting may have been untimely, even though the RFP did not trigger the time to file a charge. We now remand to the Board to further consider the timeliness of that claim and for other consideration as outlined in this opinion.


¶ 4                              BACKGROUND

¶ 5                          A. The Stipulated Facts

¶ 6     The following facts are part of the stipulated record agreed to by both the Union and the CTA for its hearing before an administrative law judge (ALJ).


¶ 7               1. The Collective Bargaining Agreements

¶ 8     The Union and the CTA were parties to a collective bargaining agreement with a term of January 1, 2007, through December 31, 2011. Article II, section 2.7, of that agreement provided, in pertinent part:

> "2.7 SUBCONTRACTING The Authority shall not subcontract or assign to others work which is normally and regularly performed by employees within the collective bargaining unit of Local 241, except in cases of emergency when the work or service required cannot be performed by the available complement of unit members. The Authority reserves the right to continue its present practice of contracting out certain work of the nature and type contracted out in the past."

The 2007-11 collective bargaining agreement also provided for a "grievance procedure culminating in final and binding arbitration."

¶ 9    In December 2012, the Union and the CTA signed a tentative agreement for a successor collective bargaining agreement with a stated term from January 1, 2012, through December 31, 2015. The tentative agreement was ratified by both the Union's membership and the Chicago Transit Board that same month. It did not alter the language of article II, section 2.7, as it appeared in the 2007-11 collective bargaining agreement and also provided for a "grievance procedure culminating in final and binding arbitration."

¶ 10                    2. The Open Fare Payment Collection System

¶ 11    According to the stipulated record, beginning in 2009, Chicago newspapers published articles about the development of "a single smart card" for use on the CTA, Pace suburban bus lines, and the Metra commuter rail system. In a press release issued on August 12, 2009, the CTA stated that the transition to the new system "would save the CTA in money now used to issue fare media and manage the fare payment and collection system." The CTA explained that the project would have two phases, stating:

> "The first phase of the procurement process will examine the CTA's options for developing the card—considering possible procedures, management and cost of the program. After reviewing these proposals and developing a final plan, the second phase will give companies the opportunity to submit proposals for the actual implementation of the program."

The CTA concluded that it expected "to complete the two-step RFP process and begin the transition to an open fare system [the following] summer." Later that same month, on August 24, the CTA issued its RFP for the first phase of the project.

¶ 12    On September 28, 2010, the CTA issued a press release, published on its website, stating that it was "preparing the next phase of its move toward an open fare payment [collection] system" and that, on that day, it was "issuing a Request for Proposal *** on the design, implementation, and operation of an open fare [payment] collection system." In its press release, the CTA also indicated that during the "first phase of the bid process, [it] received initial proposals from 12 private sector teams interested in partnering with the agency on the design, implementation, and operation of an open fare payment collection system."

¶ 13    The CTA's follow-up RFP, titled "Request for Proposals (RFP) Step Two to Provide an Open Fare Payment Collection System," is the RFP that the CTA forwarded to the Union and that the Board found triggered the statute of limitations. The RFP cover page indicated that the CTA was "seeking proposals for the subject project" and that proposals would be accepted until November 5, 2010. The RFP itself was 190 pages and attached 24 appendices totaling over 300 additional pages. Page 23 of the RFP stated, in relevant part, that to achieve its business goals:

> "CTA requires that the Contractor propose a business, technical, and operating solution that would design, finance, acquire, implement, certify, operate, maintain, repair, upgrade, and replace a fully operational [open fare payment collection system], according to the business and technical criteria. Upon full implementation of the [system], *** the Contractor will have full responsibility for successful operation,

maintenance, repair and replacement of the [system] including the provision of all required support functions needed to meet the Performance Standards."

The CTA further indicated on page 23 of the RFP that the contractor would supply support functions for the system, including the "[p]rocessing of all payments, electronic and cash, due to CTA from the [system]."

¶ 14    On September 29, 2010, the CTA's then-vice president of human relations, Robert Gierut, mailed a copy of the RFP to the then-president of the Union, Darrell Jefferson. In his letter, Mr. Gierut simply stated that he was "confirm[ing] transmittal of a copy of the *** RFP for [Mr. Jefferson's] review" and that Mr. Jefferson should "feel free to contact the Project Manager" with any questions about the RFP.

¶ 15                    3. Ventra Implementation and Elimination of Union Jobs

¶ 16    In July 2011, Public Act 97-85 was enacted, amending section 2.04 of the Regional Transportation Authority Act (70 ILCS 3615/2.04 (West 2010)) to require that the CTA "develop and implement a regional fare payment system" by January 1, 2015. Pub. Act 97-85, § 10 (eff. July 7, 2011).

¶ 17    The Chicago Transit Board enacted ordinance No. 011-143 in November 2011, stating that it had "identified Cubic Transportation Systems Chicago, Inc. as the contractor whose proposal best meets the [CTA]'s requirements to provide the [open fare payment collection system]." Chicago Transit Board Ordinance No. 011-143 (approved Nov. 15, 2011). The ordinance authorized the CTA to enter into a contract with Cubic Transportation Systems. *Id.*

¶ 18    At the same time, the CTA issued a press release about the ordinance, stating that it had "approved an agreement to implement a new, open standards based fare-collection system" and that it had "awarded the $454 million contract to Cubic Transportation Systems." The Chicago Tribune also ran an article that day about the expected approval of the "$454 million, 12-year contract for a new fare-collection system." Jon Hilkevitch, *CTA Plan Would Let Riders Pay Fares With Credit Cards*, Chi. Trib. (Nov. 15, 2011), http://articles.chicagotribune.com/2011-11-15/news/ct-met-cta-fares-1115-20111115_1_chicago-cards-cubic-transportation-systems-prepaid-cards.

¶ 19    Subsequently, the CTA announced in a press release that Pace would also be taking part in the new fare payment collection system and had joined the contract with Cubic Transportation Systems. In a September 2012 press release, the CTA and Pace "unveiled Ventra™," the system being implemented by Cubic Transportation Systems, which the press release described as "a new fare payment system that will provide CTA and Pace customers with a new and more convenient way to pay for train and bus rides." The CTA also stated that transition to the new system for both the CTA and Pace was expected to begin in the summer of 2013, with a system-wide implementation expected by 2014. In the spring and summer of 2013, the CTA held a public hearing and issued another press release about Ventra on its website.

¶ 20    Ventra became operational in September 2013, and on September 4, 2013, "the CTA for the first time informed the Union that it would be eliminating *** 8 classifications" including "Cashier, Revenue Collector, Fare Media Operations Clerk, Student Riding Pass Representative, Treasury Clerk, Money Handler II, Money Handler IV, and Vault Service Clerk." Those classifications encompassed "24 bargaining unit positions." Since September 4,

2013, the duties previously performed by the Union personnel in those 24 positions have been performed by non-Union personnel.

¶ 21 On September 11, 2013, the CTA Committee on Finance, Audit and Budget and the Chicago Transit Board approved the elimination of the eight classifications and the elimination of the associated 24 bargaining unit positions. That same day, the Chicago Transit Board enacted ordinance No. 013-128 (Chicago Transit Authority Ordinance No. 013-128 (approved Sept. 11, 2013)), which authorized the elimination of those 24 positions, and the CTA informed the 24 affected employees that their positions were to be eliminated. The Union was given no opportunity to bargain with the CTA about this decision. Although the employees whose positions were eliminated did not ultimately lose employment, "those employees were subject to a loss of pay, changes in work location and schedule, and a loss of seniority rights as it related to picking schedules and vacations in the different classifications."

¶ 22 B. The Unfair Labor Practice Charge

¶ 23 The Union filed its initial unfair labor practice charge with the Board on September 18, 2013, alleging that the CTA engaged in an unfair labor practice when it informed the Union that "bargaining unit jobs were being 'abolished' as a result of its decision to sub-contract certain fare revenue operations." According to the Union, in taking this action, the CTA failed to provide an opportunity for bargaining over the decision and unilaterally altered "the terms and conditions of bargaining unit members." The Union also alleged that the CTA had "failed and refused to bargain over notices and procedures by which members affected by the abolishments can utilize their [collective bargaining agreement] rights to bump into other positions," had "failed to provide an opportunity to arbitrate the contractual issues," and had taken the above actions in retaliation against the Union.

¶ 24 On April 30, 2014, the executive director of the Board issued a "Complaint for Hearing" (complaint) based on the Union's charge. The complaint alleged that with the introduction of the Ventra system, the CTA subcontracted Union work to an outside vendor. It also alleged that the introduction of the Ventra system resulted in the CTA abolishing the positions of 24 Union members. The complaint alleged a violation of sections 10(a)(1) and (4) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1), (a)(4) (West 2012)) because these actions were taken without adequate notice to the Union and a meaningful opportunity to bargain. In January 2015, the parties filed a stipulated record for the hearing before the ALJ. There was no testimony taken at the hearing.

¶ 25 The complaint also alleged a violation of section 10(a)(2) of the Act (5 ILCS 315/10(a)(2) (West 2012)), prohibiting discrimination, and a violation based on the CTA's refusal to arbitrate a Union grievance over subcontracting. These two allegations are not at issue in this appeal.

¶ 26 C. The Decisions of the ALJ and the Board

¶ 27 In July 2015, the ALJ issued her "Recommended Decision and Order" (recommended decision), finding that (1) the Union's charge with respect to the CTA subcontracting was untimely because the six-month limitations period was triggered when, on September 29, 2010, the CTA's vice president of human relations mailed a copy of the RFP to the president of the Union and a charge was not filed until September 18, 2013, and (2) the Union's charge with respect to the elimination of bargaining unit positions was without merit because the CTA did

not have an obligation to bargain on that issue. In March 2016, the Board adopted the ALJ's recommended decision with a slight modification that is not relevant to the issues on appeal and, in April 2016, the Union filed its petition for review in this court.

¶ 28                                JURISDICTION

¶ 29     The Board issued and served its final administrative decision on March 11, 2016. The Union timely filed the present appeal on April 15, 2016, within 35 days as permitted by section 11(e) of the Act (5 ILCS 315/11(e) (West 2014)). Accordingly, this court has jurisdiction over this direct appeal from the Board's ruling pursuant to that section, as well as section 3-113 of the Administrative Review Law (735 ILCS 5/3-113 (West 2014)) and Illinois Supreme Court Rule 335 (eff. Jan. 1, 2016).

¶ 30                                  ANALYSIS
¶ 31                             A. Standard of Review

¶ 32     Our review of the Board's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq*. (West 2014)). *Clerk of the Circuit Court of Lake County v. Illinois Labor Relations Board, State Panel*, 2016 IL App (2d) 150849, ¶ 25. There is a threshold legal issue as to whether an employer's request for proposals from third parties in reference to performing bargaining unit work can trigger the time to file an unfair labor practice charge for subcontracting that work. On this legal issue our review is *de novo*. *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 542 (2007); see also *Michels v. Illinois Labor Relations Board*, 2012 IL App (4th) 110612, ¶ 37 (" 'The application of a statute of limitations period is a question of law, which we review *de novo*.' " (quoting *Travelers Casualty & Surety Co. v. Bowman*, 229 Ill. 2d 461, 466 (2008))).

¶ 33     On the other issues in this case our standard of review is whether the Board's decision was clearly erroneous, requiring the application of undisputed facts in the stipulated record to statutory standards. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008). As our supreme court has made clear, a decision of an administrative agency is clearly erroneous "only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001). However, this deferential standard does not mean that "a reviewing court must blindly defer to the agency's decision." *Id.*

¶ 34                        B. The Unfair Labor Practice Charge

¶ 35     The complaint filed based on the Union's unfair labor practice charge alleged that the CTA violated sections 10(a)(1) and (4) of the Act. 5 ILCS 315/10(a)(1), (a)(4) (West 2012). In order to prove a violation of section 10(a)(1), a charging party must establish, by a preponderance of the evidence, that the employer engaged in conduct that reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their rights under the Act. 5 ILCS 315/10(a)(1) (West 2012). Under section 10(a)(4) of the Act, it is an unfair labor practice for a public employer or its agents "to refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit." 5 ILCS 315/10(a)(4) (West 2012). If the public employer fails to bargain, it violates not only

its duty under section 10(a)(4) but, derivatively, it also violates its duty under section 10(a)(1) of the Act. *Wheaton Firefighters Union, Local 3706 v. Illinois Labor Relations Board, State Panel*, 2016 IL App (2d) 160105, ¶ 15. A public employer also violates its obligation to bargain in good faith, and therefore sections 10(a)(1) and (4) of the Act, when it makes a unilateral change in a mandatory subject of bargaining without granting notice and an opportunity to bargain with its employees' exclusive bargaining representative. See *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 522 (1992).

¶ 36 The two issues on appeal are (1) whether the Union's charge was timely filed as to the CTA's decision to subcontract bargaining unit work and (2) whether the CTA's decision to eliminate 24 bargaining unit positions was a mandatory subject of bargaining. We consider each issue in turn.

¶ 37                          1. Timeliness of the Charge as to Subcontracting

¶ 38 We first consider the timeliness of the Union's charge alleging that the CTA violated the Act by unilaterally transferring bargaining unit work and repudiated the parties' agreement by subcontracting that work out to a third party. The Board ruled that these claims were untimely because the six-month limitations period was triggered when the CTA sent a copy of the second stage RFP to the Union's president on September 29, 2010, and the Union did not file its charge until September 18, 2013. The Union argues that sending it a copy of the RFP was insufficient to trigger the statutory time period for filing a charge. We agree with the Union, as we did in our initial decision, that sending an RFP is not sufficient to trigger the time to file a charge. But based on the arguments put forth by the CTA and the Board in their petitions for rehearing, we now recognize that the time to file the charge could have been triggered sometime after the RFP was sent in November 2010 but before the CTA informed the Union that it would be eliminating Union positions in September 2013. We remand to the Board for further consideration as to the timeliness of this charge and for consideration of the merits of this charge, if it was timely filed.

¶ 39                          a. Sufficiency of the RFP to Trigger Notice

¶ 40 Section 11 of the Act provides that, whenever an unfair labor practice is charged, "the Board *** shall conduct an investigation of the charge" "*provided that no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of a charge* with the Board." (Emphasis added.) 5 ILCS 315/11(a) (West 2012).

¶ 41 We have recognized that the six-month filing period begins to run "when the charging party learns or has notice of the actions which constitute the alleged unfair labor practice." *Chicago Joint Board, Local 200 v. Illinois Labor Relations Board*, 2011 IL App (1st) 101497, ¶ 22. The RFP, which is what the Board found triggered the charge here, was not an action that was alleged to be an "unfair labor practice." There is no prohibition in the collective bargaining agreement on soliciting proposals from outside contractors and thus no requirement that the CTA bargain before it solicits bids. In finding that the RFP triggered the time to file a charge, the Board relied on our recognition that the time for filing an unfair labor practice can be triggered before a violation has actually occurred, when "the aggrieved party becomes aware, or should become aware, of a change in personnel policy that is 'unambiguously announced.' " *Water Pipe Extension v. City of Chicago*, 206 Ill. App. 3d 63, 68 (1990) (quotin*g Wapella*

*Education Ass'n v. Illinois Educational Labor Relations Board*, 177 Ill. App. 3d 153, 168 (1988)). However, we find that the Board erred in concluding that the RFP was an "unambiguous announcement" that the CTA was going to subcontract Union work.

¶ 42    The question of whether the issuance of an RFP is the "unambiguous announcement" required to trigger the statute of limitations for filing a charge is, as the parties recognize, an issue of first impression both for the Board and for this court. For the reasons that follow, we find that it is not and that, in ruling otherwise, the Board erred in its legal determination of what is sufficient to trigger the statute of limitations under the Act.

¶ 43    The ALJ stated in her recommended decision, which the Board adopted, that "[a]s a general matter, an employer's notice to a union that it seeks to solicit bids from contractors to perform bargaining unit work constitutes an unambiguous announcement of an allegedly unlawful transfer of unit work out of the unit" (citing *Manhasset Educational Support Personnel Ass'n*, 41 PERB ¶ 3005 (N.Y. Pub. Emp't Relations Bd. 2008)). The ALJ and the Board relied on two decisions from New York, which viewed an RFP as sufficient to trigger the statute of limitations for filing an unfair labor practice charge so long as that RFP appeared to be a genuine request by the employer to solicit bids from third parties to take over union work.

¶ 44    In *Manhasset*, the New York Public Employment Relations Board (New York PERB) held that a union's time for filing its charge against a school district was not triggered by the school district's commencement of a bid solicitation process for "the possible outsourcing" of the school district's program for transporting students. *Id.* The New York PERB noted that, six years previously, the school district had solicited bids but decided against subcontracting and, instead, decided to " 'check the market every four or five years' in order to determine whether it should modify the means of delivering student transportation services." *Id.*

¶ 45    The New York PERB in *Manhasset* distinguished *In re Board of Education of Union-Endicott Central School District*, 681 N.Y.S.2d 391 (App. Div. 1998). There, the court held that the unfair labor practice claim at issue accrued when a school district began soliciting bids for bargaining unit work because "[a]t that point (to the extent that it ever could be), the damage to the union employees was readily ascertainable." *Union-Endicott*, 681 N.Y.S.2d at 394.

¶ 46    The ALJ in this case found that "the CTA established no pattern of declining to subcontract after soliciting bids, such that the solicitation of bids would be inadequate notice of the CTA's decision to subcontract." The Board adopted the ALJ's recommended decision on this point. That decision, following the New York cases, began with the premise that a union's awareness that an employer has issued an RFP is sufficient to trigger the time to file a charge unless, as in *Manhasset*, there are circumstances to suggest that the employer is simply "checking the market" and is not genuinely intending to subcontract union work.

¶ 47    In response to the New York cases, the Union in this case relied on *California School Employees Ass'n*, Decision No. 1440 (Cal. Pub. Emp't Relations Bd. 2001), http://www.perb.ca.gov/decisionbank/pdfs/1440.pdf (*Lucia Mar*), where the California Public Employment Relations Board (California PERB) held that an RFP did not trigger the statute of limitations. The ALJ in *Lucia Mar* noted in his decision, which was adopted by the California PERB, that "[a]t the same time the board approved the RFP, it also created the new Ad Hoc Committee 'to study the pros and cons of contract busing.' " *Id.*, app. at 25 (Proposed Decision). The Union insisted to the Board and insists to this court that such facts are likewise

present here. Specifically, the Union points out that, in the RFP, the CTA stated that it reserved the right to "accept or reject any or all Proposals" and to "refuse to enter into any Agreement resulting from any Proposal submitted."

¶ 48    On appeal before this court, the Board urges us to adopt the rule followed in New York and points out that, in contrast to the situation in *Manhasset* and *Lucia Mar*, there is no history in this case demonstrating that the CTA's RFP was not intended to be a true solicitation of bids or that the CTA was simply checking the market and had not yet made a final decision to subcontract. The Board makes a policy argument that, if a union were able to wait until the employer actually implements its decision to subcontract by awarding the contract, the parties would lose any opportunity to meaningfully discuss cost-saving alternatives to outsourcing after an unfair labor practice charge has been filed but before a contract has been awarded.

¶ 49    However, we reject the Board's premise that the solicitation of bids is an unambiguous announcement that the employer is going to violate a prohibition on subcontracting union work. As the cases cited by both parties show, an employer may or may not actually award a contract after soliciting proposals. In two of the three cases cited by the parties, the boards looked to surrounding circumstances and determined that the RFP did not mean that the employer was actually going to enter into a contract. See *Manhasset*, 41 PERB ¶ 3005 ("In the present case, the Associations claim *** did not accrue from the commencement of the bid solicitation process *** based on the conduct of the District" in, for example, soliciting bids but ultimately declining to subcontract six years prior); *Lucia Mar*, Decision No. 1440, app. at 25 (Proposed Decision) (noting various actions taken by the board at the same time it approved the issuance of an RFP and concluding the RFP "was merely the start of the fact-finding process, not an indication of a final decision made by the board"). Surrounding circumstances are exactly what courts look at to resolve ambiguities. *Cf.*, *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011) (noting that, in interpreting a contract, extrinsic evidence may be considered when the language of the contract is facially ambiguous); *Gillespie Community Unit School District No. 7, Macoupin County, Illinois v. Union Pacific R.R. Co.*, 2015 IL App (4th) 140877, ¶ 91 (the extrinsic evidence to be considered includes the "surrounding circumstances" at the time the contract was executed). While the surrounding circumstances in this case may well support the Board's determination that here the RFP was a genuine step toward entering into a subcontract for Ventra, the need to look at such circumstances demonstrates that the RFP itself was not an "unambiguous announcement" that subcontracting would occur.

¶ 50    As we did in our original decision, we reject the Union's argument that the decision to subcontract must actually be implemented in order to trigger the time to file a charge. As we recognized long ago in *Wapella*, a decision by the employer that the union alleges is an unfair labor practice does not need to have been implemented before the time is triggered to file a charge. Rather, the limitations period can begin to run when the employer's decision is "unambiguously announced," and this may be before the decision is implemented. *Wapella*, 177 Ill. App. 3d at 168. But nothing in *Wapella* or in the cases following it suggests that the statute of limitations is triggered when the "announcement" is something other than an express statement by the employer that it is going to take an action that the union believes violates the collective bargaining agreement.

¶ 51    In *Wapella*, the court agreed with the Illinois Education Labor Relations Board's conclusion that the time for the union to file its charge was triggered when a school district

announced it would no longer grant teachers credit on the salary schedule for teaching experience in other districts. *Id.* As the court explained, "the claimed unfair labor practice is the unilateral change in policy not its application to particular individuals *per se*." *Id.*

¶ 52    Since our decision in *Wapella*, the Board has ruled that the time to file a charge was triggered when an employer unambiguously announced to a union president that it would terminate employees who lacked a newly required license. *Service Employees International Union, Local 73*, 32 PERI ¶ 68 (ILRB Local Panel 2015). The Board has also relied on *Wapella* to find that the statute of limitations for filing a charge was triggered when an employer expressly advised a union that union members would be terminated on a specific future date. *North Riverside Fire Fighters, Local 2714*, 33 PERI ¶ 33 (ILRB State Panel 2016). Both of these cases involved statements by the employer that it had decided to take an action that was alleged by the union to require bargaining under the Act.

¶ 53    The RFP that the Board relies on in this case did not announce a decision by the employer to subcontract Union work. What the CTA "announced" was that it was soliciting proposals from third parties to do that work. Soliciting proposals from third parties to do Union work is not a violation of the collective bargaining agreement. While the RFP might have been strong evidence that the CTA intended to award a contract to a third party to do Union work, the RFP itself did not unambiguously proclaim that to be the case. The Board's decision in this case that the subcontracting charge was untimely rested on a mistaken notion of what the employer needs to "announce" in order to trigger the statute of limitations.

¶ 54    Requiring explicit notice that a decision has been made protects the unions, the Board, and the courts from having to second-guess what an employer's intentions were when it issued a request for proposals or solicited bids. Requiring an explicit announcement also avoids any gamesmanship by an employer who might hope that a union will not recognize that a request for proposals is intended as the announcement of a decision by the employer to subcontract bargaining unit work. At the same time, once the employer unambiguously and expressly announces that it intends to subcontract, the union and the employer still could have time to engage in meaningful negotiations before the employer signs an agreement with a third party.

¶ 55    We recognize that this holding is not consistent with the New York cases relied upon by the Board. But those cases are not controlling here. See *U.S. Residential Management & Development, LLC v. Head*, 397 Ill. App. 3d 156, 164 (2009) (noting that holdings from other jurisdictions are not binding on this court). In addition, we note that the statute relied upon in the New York cases is different than the statute that controls in Illinois. Compare N.Y. Educ. Law § 3813(1) (McKinney 1992) (expressing the limitations period in terms of the *accrual* of a claim), with 5 ILCS 315/11(a) (West 2012) (expressing the limitations period in terms of the *occurrence* of an unfair labor practice). Indeed, the court in *Union-Endicott* expressly relied on the unusual triggering language in the New York statute as a basis for its decision. *Union-Endicott*, 681 N.Y.S.2d at 394.

¶ 56                          b. Other Events Triggering the Statute of Limitations

¶ 57    The CTA stressed in its petition for rehearing that the fact that it had awarded a contract to Cubic to do the Ventra work in November 2011—almost two years before the Union filed its charge in September 2013—was widely publicized. We recited some of this publicity in our initial decision, but we did not consider whether this case should have been remanded to the Board for consideration of whether the Union was on notice that this contract had actually been

awarded more than six months before it filed its unfair labor practice charge. We note that this issue was not raised by the parties until the CTA filed its petition for rehearing.

¶ 58    The Union contends that we should not consider the CTA's argument for two reasons: first, because the CTA forfeited this argument when it chose not to file a brief before this court or participate in oral argument and, second, because the Board already considered and rejected this "constructive knowledge" trigger for the statute of limitations. We do not find either of these arguments persuasive.

¶ 59    As the Union points out, under our supreme court rules, both appellees and appellants forfeit any points not argued in their initial briefs. See Ill. S. Ct. Rs. 341(h)(7) ("Points not argued [by appellant in the opening brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); 341(i) (requiring that appellee briefs comply with Rule 341(h)(7)) (eff. Feb. 6, 2013).[1] See also *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56 ("Failure to comply with [Rule 341's] requirements results in forfeiture.").

¶ 60    However, forfeiture is "a limitation on the parties and not on this court, which has a responsibility to achieve a just result and maintain a sound and uniform body of precedent." *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 44. So while we may disregard this new argument put forth by the CTA on rehearing, we are not required to do so. To the contrary, we are free to address on rehearing something that we may have " 'overlooked or misapprehended' in our initial decision." *Getto v. City of Chicago*, 392 Ill. App. 3d 232, 237 (2009) (quoting Ill. S. Ct. R. 367(b) (eff. Sept. 1, 2006)). Upon reexamination of this case on rehearing, we realize that in our initial decision we overlooked the possibility that the Union had notice that the CTA had actually entered into a contract with Cubic to perform Union work more than six months before it filed its charge.

¶ 61    We also do not agree with the Union's suggestion that the ALJ's recommend decision, which was adopted by the Board in relevant part, already addressed and rejected this argument. The Union is correct that the CTA argued to the ALJ in its posthearing brief that "[t]he CTA publicly announced its contract with Cubic to develop, operate, and maintain the new system in November 2011." But the ALJ had no reason to decide whether this was sufficient to trigger the statute of limitations because she had already determined that the CTA's transmittal of the RFP to the Union, on September 29, 2010, was a trigger. She considered the publicity surrounding the Cubic contract *only* in reference to the timeliness of the charge on eliminating the specific Union positions as opposed to the charge on subcontracting Union work. The ALJ found that the RFP did not trigger the former because the "news articles, press releases, and CTA website postings d[id] not provide the Union with clear and unambiguous notice of the CTA's decision to eliminate bargaining unit positions." Specifically, the ALJ noted that the

---

[1]Our supreme court has recognized that waiver and forfeiture are terms that are often used interchangeably but that "there is a difference"—namely, "[w]hile waiver is the voluntary relinquishment of a known right, forfeiture is the failure to timely comply with procedural requirements." (Internal quotation marks omitted.) *People v. Hughes*, 2015 IL 117242, ¶ 37. Despite the wording of Rule 341(h)(7), which references "waiver," our supreme court has, on many occasions, addressed a party's failure to comply with Rule 341 as forfeiture. See, *e.g.*, *BAC Home Loans Servicing, LP v. Mitchell*, 2014 IL 116311, ¶ 23 ("this court has repeatedly held an appellant's failure to argue a point in the opening brief results in forfeiture under *** Rule 341(h)(7)").

publicity did "not expressly reference CTA employees, *** ma[d]e no mention of particular bargaining unit titles and *** d[id] not explain that the CTA planned to eliminate employees who performed CTA fair collection duties." The ALJ's recommended decision simply did not address the possibility that these news items—which, as we noted in our initial decision, specifically stated that "The CTA awarded the $454 million contract to Cubic Transportation Systems" for a new open fare payment collection system—were sufficient to put the Union on notice that the CTA had subcontracted Union work.

¶ 62    Having thus considered and rejected the Union's two reasons that we should not do so, we find that the appropriate resolution is for us to remand this cause to the Board to consider in the first instance, in light of its expertise in this area, when the Union had notice of the contract between the CTA and Cubic, and whether that date made the Union's charge untimely in reference to subcontracting. In the event that the Board determines this charge to be timely, it should then consider the merits of the Union's charge as to subcontracting.

¶ 63                              2. The Elimination of Bargaining Unit Positions

¶ 64    We now turn to the Union's charge that the CTA committed an unfair labor practice by eliminating 24 Union positions without providing the Union with notice and an opportunity to bargain. The Board found the charge was timely with respect to this issue because the trigger for the limitations period did not occur until the 24 bargaining unit employees were notified that their positions were eliminated on September 11, 2013, just one week before the charge was filed. But the Board also adopted the ALJ's ruling that eliminating these positions was not a mandatory subject of bargaining and that the CTA was therefore entitled to eliminate these positions without providing the Union with either prior notice or an opportunity to bargain.

¶ 65    In making this determination, the ALJ used the three-part test from *Central City*:

> "The first part of the test requires a determination of whether the matter is one of wages, hours and terms and conditions of employment. This is a question that the [board] is uniquely qualified to answer, given its experience and understanding of bargaining in education labor relations. If the answer to this question is no, the inquiry ends and the employer is under no duty to bargain.
>
> If the answer to the first question is yes, then the second question is asked: Is the matter also one of inherent managerial authority? If the answer to the second question is no, then the analysis stops and the matter is a mandatory subject of bargaining. If the answer is yes, then the hybrid situation discussed in section 4 exists: the matter is within the inherent managerial authority of the employer and it also affects wages, hours and terms and conditions of employment.
>
> At this point in the analysis, the [board] should balance the benefits that bargaining will have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority. Which issues are mandatory, and which are not, will be very fact-specific questions, which the [board] is eminently qualified to resolve." *Central City*, 149 Ill. 2d at 523.

¶ 66    The ALJ first found, and both parties agree, that eliminating those Union positions was a matter "of wages, hours and terms of conditions of employment." Although the CTA rescinded its initial decision to terminate the 24 employees whose positions were impacted, instead transferring them to other positions, those employees lost pay and seniority rights, and their

work locations and schedules changed. The employees' wages, hours, and the terms and conditions of their employment were clearly impacted.

¶ 67    In response to the second *Central City* question, the ALJ found that eliminating those positions was a matter of "inherent managerial authority" because it was a part of the CTA's broader decision to bring about a legitimate reorganization and, more specifically, because the Ventra program was a change in the nature or essence of the services that the CTA provides. The Union, however, disputes this finding on several bases.

¶ 68    First, the Union argues that the CTA waived any right to claim that it has inherent managerial authority to subcontract because it agreed to section 2.7 of the parties' collective bargaining agreement, which states that the CTA will "not subcontract or assign to others work which is normally and regularly performed by employees within the collective bargain unit," except in cases of emergency. The ALJ did not address this argument in her recommended decision, the Board did not address it in its decision, and the Board barely addresses this argument on appeal, except to argue that any claim about subcontracting was not timely filed. As we held in our initial decision, we believe that the Board is better equipped than we are to address this waiver argument in the first instance and should do so on remand.

¶ 69    The Union also challenges the Board's determination that the CTA's decision to eliminate positions was "a matter of inherent managerial authority because it was part of the CTA's broader decision to effect a legitimate reorganization" as clearly erroneous. We will address this argument because it is likely to reoccur on remand. See *Central City*, 149 Ill. 2d at 524 ("Issues have been raised in these causes which are likely to reappear on remand, and in the interest of judicial economy the court will examine them now.").

¶ 70    In order to establish that an employer's action was a legitimate reorganization and, as such, a matter of inherent managerial authority, that employer must show:

> "(1) that its organizational structure has been fundamentally altered; (2) that the nature or essence of the services provided has been substantially changed; or (3) that the nature and essence of a position has been substantively altered such that the occupants of that position no longer have the same qualifications, perform the same functions, or have the same purpose or focus as had the previous employees." *American Federation of State, County & Municipal Employees, Council 31*, 17 PERI ¶ 2046 (ISLRB 2001).

"Absent such a basic or substantial change to the Employer's organizational structure or services provided, or to a fundamental essence of a position, we will not find an employer's decision a matter of inherent managerial authority." *Id.*

¶ 71    The ALJ agreed with the Union that the CTA met neither the first nor the third part of the test. She noted that the simple elimination of titles that performed related duties, while the rest of the organization remained unchanged, did not constitute a fundamental alteration of the organizational structure (citing *American Federation of State, County & Municipal Employees, Council 31*, 28 PERI ¶ 67 (ILRB State Panel 2011), and *Peoria Firefighters Ass'n, Local 544*, 3 PERI ¶ 2025 (ISLRB 1987)). In addition, she observed that the CTA did not make substantive alterations to any positions "because both the eliminated positions and the successor positions perform fare collection duties" and, accordingly, the installation of the new fare collection equipment was irrelevant (citing *Teamsters, Local Union No. 714*, 12 PERI ¶ 3021 (ILLRB 1996)).

¶ 72   With respect to the second part of the test for determining whether an employer's action was a legitimate reorganization, however, the ALJ found that the CTA *did* substantially change the nature or essence of the services it provides and that eliminating the 24 positions was a part of that change. As she stated in her recommended decision, "[a]n employer changes the nature and essence of its services when it alters the manner in which it communicates with the public and changes the way it provides its existing services" (citing *American Federation of State, County & Municipal Employees, Council 31*, 29 PERI ¶ 162 (ILRB State Panel 2013)). The ALJ observed that, here, the CTA changed the services it provides to the public because the new system "increas[ed] the ease with which customers paid for their fares and entered its mass transit system" by "allow[ing] customers to pay for fares using credit/debit cards instead of relying on CTA issued tickets, and permit[ing] 'tap and go' entrance to CTA mass transit instead of requiring customers to slip their cards into card readers." She noted that the "CTA effectuated these improvements to its services by delegating the entire fare collection process *** to an outside contractor and, in turn, eliminating the unit positions that performed fare collection under the antiquated system." The ALJ concluded that, based on the above, the CTA had "fundamentally changed the way it provided *** mass transit services to its customers," and therefore the CTA showed that its action was a legitimate reorganization and a matter of inherent managerial authority. See *American Federation of State, County & Municipal Employees, Council 31*, 17 PERI ¶ 2046 (ISLRB 2001). The ALJ's conclusions and reasoning on this subject were adopted by the Board.

¶ 73   We do not find these conclusions or this reasoning to be clearly erroneous. The Union argues that the ALJ was incorrect in her conclusion that Ventra represented a change because it allowed customers to enter the system more rapidly via a "tap and go" process, insisting that the CTA's prior fare system already provided for "tap and go." In support of its argument, the Union cites a newspaper article that says "tap and go" existed before Ventra, which does not convince us that the ALJ's finding was "clearly erroneous." Moreover, even if, as the Union argues, the only change brought by Ventra was moving from a "closed" system, which only allowed customers to access the CTA, to the "open" Ventra system, which allows customers, through a single card, to pay their fares and access the metropolitan mass transit system, including suburban bus lines and regional commuter rail, this change would be sufficient to support the ALJ's conclusion that there was a "legitimate and significant change" in the services the CTA provided. As such, it was not clearly erroneous for her to find that the CTA was exercising inherent managerial authority when it eliminated the 24 positions as part of bringing in Ventra. Therefore, unless the Board finds on remand that the CTA has waived any managerial authority over this issue, it must proceed to the third part of the *Central City* test in which it balances the benefits that bargaining will have on the decision making process with the burdens that bargaining imposes on the employer's authority.

¶ 74   The ALJ's application of the third part of the *Central City* test in this case rested, in significant part, on her belief that "[t]he usual benefits of bargaining over the elimination of unit positions do not exist in this case where the CTA's action is simply the final step of a broader change that the Union failed to timely protest." Although this made sense in the context of her recommended decision, if, on remand, the Board finds that the Union's protest was in fact timely as to subcontracting, this analysis must be reexamined.

¶ 75                                    CONCLUSION

¶ 76       In sum, the time for filing the charge in reference to subcontracting was not triggered by the RFP. For the reasons set forth in this opinion, the Board is directed on remand to consider whether the time to file was otherwise triggered more than six months before the date that the charge was filed. If the Board finds that the subcontracting charge was timely, the Board is directed to consider the merits of that charge. The Board is further directed to reconsider its determination that the elimination of positions was not a mandatory subject of bargaining by addressing the Union's argument that the CTA waived its rights on this issue and by applying the balancing aspect of the *Central City* test in the context of a timely filed subcontracting charge, if it finds that the subcontracting charge was timely filed.

¶ 77       For the foregoing reasons, we set aside the decision of the Board and remand for further proceedings consistent with this opinion.

¶ 78       Set aside and remanded.