# Illinois Official Reports

## Appellate Court

---

### *Katz v. Hartz*, 2021 IL App (1st) 200331

---

| | |
|---|---|
| Appellate Court Caption | P. ANDRE KATZ, Individually and as Limited Guardian for the Estate of Alyce K. Newman, Plaintiff-Appellant, v. MICHAEL HARTZ; ELIZABETH KREASY; and KATTEN MUCHIN ROSENMAN, LLP, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>No. 1-20-0331 |
| Filed | March 12, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 19-L-07155; the Hon. Michael F. Otto, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael Shiba, of Chicago, for appellant.<br><br>Timothy J. Patenode, John K. Whitaker, and Sarah M. Scruton, of Katten Muchin Rosenman LLP, of Chicago, for appellees. |
| Panel | PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.<br>Justices Connors and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1        In this appeal from the dismissal of claims against his mother's former lawyers, plaintiff P. Andre Katz (Andre) argues that the two-year period specified in the statute of limitations did not begin running until he had reason to believe that the lawyers were specific parties who had caused him injury. Andre maintains that, although he knew his brother Leonard Katz had caused their mother to change her estate plan to Andre's detriment, it was not until he deposed one of her lawyers that he discovered they had negligently failed to determine whether she had the requisite mental capacity to make those changes.

¶ 2        The attorneys, Michael Hartz, Elizabeth Kreasy, and their law firm, Katten Muchin Rosenman, LLP, in Chicago (collectively, Katten), argue that the limitations period began running at an earlier point—on the date Andre filed a petition to become his mother's temporary guardian. Andre knew at that time that Katten had represented his mother in connection with the changes to her estate plan and, Katten maintains, he was thus on inquiry notice to discover if the firm had some liability. The circuit court agreed with Katten that Andre's claims were time-barred and granted its motion to dismiss his complaint with prejudice pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2018)).

¶ 3        Andre argues that we should reverse the circuit court's dismissal of his claims because (1) the limitations period did not begin running until he learned during a deposition of the specific actions his mother's lawyers took or failed to take to verify that she had the requisite capacity to alter her estate plan and (2) the limitations period was tolled for claims Andre brought on his mother's behalf because she suffered from a disability.

¶ 4        For the following reasons, we reverse the judgment of the circuit court and remand for further proceedings consistent with this opinion.

¶ 5                                          I. BACKGROUND

¶ 6        In assessing the timeliness of Andre's complaint, we look to Andre's allegations, deposition testimony attached to and incorporated by reference into his complaint, and Andre's guardianship petition, which Katten attached to its motion to dismiss.

¶ 7        Andre alleged in his guardianship petition that his mother, Alyce K. Newman, lived with Andre's brother, Leonard, and provided Leonard with extensive financial support. Beginning in April 2016, Leonard began isolating Ms. Newman, who was, according to Andre's complaint in this matter, in the "early stages of dementia," and inserting himself into her personal and professional relationships. At the end of May 2017, Ms. Newman, accompanied by Leonard, made certain changes to her estate plan at Katten's Chicago offices that were to Andre's detriment and to Leonard's benefit. It is unclear from the record precisely when Andre learned of these changes, but he acknowledges that he was aware of them on June 9, 2017, when he filed his petition seeking appointment as Ms. Newman's temporary guardian, with the specific power to enjoin her from making any further changes to her estate plan.

¶ 8        In support of his guardianship petition, Andre alleged that he was already Ms. Newman's fiduciary (as he had long held a general power of attorney for her property and healthcare); that Leonard had a history of instability; and that Andre's access to Ms. Newman in the preceding six months had been "severely limited because of [Leonard's] physical, emotional,

and mental control over [her]." Andre attached a number of documents in support of his claims that Leonard had pressured Ms. Newman to sign letters she did not understand and interfered with her relationships with her accountant, financial advisor, and legal counsel. Andre quoted extensively from the notes of a speech therapist who had treated Ms. Newman following a hip replacement in the fall of 2016. The therapist noted that at that time Ms. Newman "exhibit[ed] difficulty attending to tasks [and] comprehending conversation," demonstrated an "inability to reason [and] difficulty with recall of personal information," and had "difficulty expressing complex thoughts and ideas."

¶ 9        The probate court granted Andre's motion for temporary guardianship on the same day his petition was filed, and Andre promptly called Katten to inform Mr. Hartz of his appointment. Andre also e-mailed the appointment order to Mr. Hartz.

¶ 10        It was not until June 27, 2019, that Andre, "as limited guardian of the estate" of his mother, Ms. Newman, filed a three-count complaint against Katten, seeking to recover both the legal expenses that had been incurred in unwinding the changes that Katten had made to Ms. Newman's estate plan and the legal fees it had charged her for making those changes. Count I alleged legal malpractice, count III alleged unjust enrichment, and in count II, apparently on his own behalf, Andre alleged a claim for tortious interference with testamentary expectancy. Andre alleged that Katten assisted Ms. Newman in amending her estate plan, which was at that time less than a year old and that, "[h]ad [Katten] bothered to evaluate [Ms. Newman]'s capacity to modify her estate plan, they would have discovered she was in the early stages of dementia and was not capable of making these decisions on her own." Andre asserted that, "[u]pon discovering Leonard's scheme and [Katten]'s participation in these improper modifications to the estate plan," he sought appointment as her guardian and "incur[red] significant amounts of time and money" unwinding the estate changes.

¶ 11        Andre attached to his complaint a transcript of the November 16, 2017, deposition of Mr. Hartz taken in the guardianship action. Mr. Hartz testified that he was first contacted by Leonard calling on Ms. Newman's behalf. In addition to one or more telephone calls in which Leonard assured Mr. Hartz that Ms. Newman was "standing right here," Leonard also brought Ms. Newman to Katten's offices on two occasions in late May 2017. Mr. Hartz acknowledged that Katten usually only handles estates worth $75 million or more but explained that the firm was willing to assist Ms. Newman with her more modest holdings, so long as she was willing to pay the firm's rates.

¶ 12        Mr. Hartz mentioned to "Lenny" that he knew Andre, who is also a lawyer, professionally. Either Ms. Newman or Leonard (Mr. Hartz could not remember who) expressed concern that Mr. Hartz would report back to Andre the changes Ms. Newman was making to her estate. Mr. Hartz assured them that, if he represented Ms. Newman, he would not disclose anything she did not want disclosed. Mr. Hartz was under the impression that Ms. Newman wanted to make these changes before she had an upcoming medical procedure or surgery and wanted to do it without Andre getting involved.

¶ 13        At their initial meeting, Ms. Newman met for some time with Mr. Hartz alone. He asked her why she had not gone back to the lawyer who drafted her estate plan several months before, and she said that, when she described the changes she wanted to make, that lawyer "got upset with her" and contacted Andre. Ms. Newman probably told Mr. Hartz more about the change and why it had upset the lawyer, but he could not remember the whole conversation. According to her, the change was something her former lawyer "didn't think was fair to do." She explained

that she had signed off on some changes that the lawyer had prepared in October because they were better than nothing, but they were not what she fully wanted and that was why she was making another change so soon. Mr. Hartz did not know, however, whether the changes he and his firm made were the ones the previous lawyer had refused to make.

¶ 14 Mr. Hartz acknowledged that, although he regularly practices in the area of estates and trusts, he has no standard practice for determining a client's mental capacity. He concluded that Ms. Newman had the requisite capacity because, in his words, "she exhibited knowledge of what [was] going on in the room, the general conversation, you know, what do you do, what kind of things do you like to do in life, and where do you go and about friends." Mr. Hartz said, "I asked. She answered. So I felt there was knowledge of her everyday existence. She told me about where her investments were and the approximate value. It's just the way she carried herself and talked about what she wanted to do with her estate." Ms. Newman revealed to Mr. Hartz her motivation for making the changes to her estate plan, explaining how much Leonard helped her and that, although she was proud of Andre for being so successful in his career, she felt he treated Leonard poorly and at times treated her poorly too.

¶ 15 One change that Ms. Newman and Leonard wanted made was the insertion of a provision stating that she could only be deemed incompetent upon the agreement of three doctors who had treated her. Mr. Hartz explained why this would be "awkward" and possibly difficult to implement. On his recommendation, a provision was instead included that Ms. Newman could only be deemed incompetent with the concurrence of a "physician of Leonard's choosing."

¶ 16 Mr. Hartz testified that he received a call from Andre on June 9, 2017. According to Mr. Hartz, Andre was "very professional about it." He understood that his mother had had estate planning done at Katten, and whether that was by Mr. Hartz or someone else in his group, he just wanted to let the firm know that he had been named as Ms. Newman's temporary guardian.

¶ 17 On August 26, 2019, Katten filed a combined motion to dismiss the complaint pursuant to sections 2-615 and 2-619 of the Code (735 ILCS 5/2-615, 2-619 (West 2018)). Katten argued that the complaint should be dismissed in its entirety pursuant to section 2-619 because it was untimely under the applicable two-year statutory limitations period. The firm insisted that Andre was on inquiry notice about Katten's role in Ms. Newman's estate plan changes no later than the filing of his June 9 guardianship petition. Katten argued in the alternative, under section 2-615, that Andre had failed to plead sufficient facts to state claims for tortious interference or unjust enrichment.

¶ 18 On December 4, 2019, after briefing and argument by the parties, the circuit court granted Katten's section 2-619 motion, denied its section 2-615 motion as moot, and dismissed the action with prejudice. On January 3, 2020, Andre filed a motion to reconsider that order, raising for the first time the argument that the statutory limitations period had been tolled during the period of his mother's disability. The circuit court denied the motion to reconsider on January 16, 2020.

¶ 19 This appeal followed.

## II. JURISDICTION

¶ 21 The circuit court granted Katten's motion to dismiss Andre's complaint on December 4, 2019, and denied Andre's timely motion to reconsider that order on January 16, 2020. Andre filed his notice of appeal on February 13, 2020. This court has jurisdiction over this matter

pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017) governing appeals from final judgments entered by the circuit court in civil cases.

## III. ANALYSIS

Where, as here, there was no evidentiary hearing, we review the circuit court's grant of Katten's section 2-619 motion *de novo*. *Weininger v. Siomopoulos*, 366 Ill. App. 3d 428, 431 (2006). "[A]dmit[ting] the legal sufficiency of [the] plaintiff's complaint," we examine whether the motion "raise[d] defects, defenses, or other affirmative matters that appear on the complaint's face or that are established by external submissions acting to defeat the complaint's allegations." *Burton v. Airborne Express, Inc.*, 367 Ill. App. 3d 1026, 1029 (2006). One ground for dismissal under this section is "[t]hat the action was not commenced within the time limited by law." 735 ILCS 5/2-619(a)(5) (West 2018).

Here, the relevant statute of limitations is section 13-214.3(b) of the Code, which provides:

> "An action for damages based on tort, contract, or otherwise (i) against an attorney arising out of an act or omission in the performance of professional services *** must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2016).

Our supreme court has held that this limitations period applies to all claims arising from a lawyer's provision of professional services—not just legal malpractice claims and not just those claims brought against a lawyer by the lawyer's client. *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 23. The parties agree that the two-year limitations period set out in section 13-214.3(b) applies to each of the claims in Andre's complaint.

## A. Application of the Discovery Rule

By providing that a cause of action accrues when the plaintiff " 'knew or reasonably should have known of the injury for which damages are sought,' " section 13-214.3(b) of the Code incorporates by reference the common-law discovery rule. *Blue Water Partners, Inc. v. Mason*, 2012 IL App (1st) 102165, ¶ 48 (quoting 735 ILCS 5/13-214.3 (West 2008) and citing *Hester v. Diaz*, 346 Ill. App. 3d 550, 553 (2004)). The purpose of that rule is to "ameliorate the potentially harsh effect of a mechanical application of the statute of limitations that would result in it expiring before a plaintiff even knows of his cause of action." *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 52. The discovery rule asks whether and when the plaintiff developed "a reasonable belief that [his] injury was caused by wrongful conduct," thereby "creating an obligation to inquire further on that issue." *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 673 (1997). "[K]nowledge that an injury was wrongfully caused," however, "does not equate to knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of action." (Emphasis and internal quotation marks omitted.) *County Line Nurseries & Landscaping, Inc. v. Kenney*, 2020 IL App (1st) 200615, ¶ 22.

When an injured person possesses "sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved" "is usually a question of fact." *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 416 (1981). It may be decided as a matter of law only when the facts and the reasonable inferences

to be drawn from those facts are undisputed. *Janetis v. Christensen*, 200 Ill. App. 3d 581, 586 (1990).

¶ 29 Here, Andre acknowledges that he was aware of his injury—the changes to Ms. Newman's estate plan—no later than June 9, 2017, when he petitioned to become her guardian, but argues that he was unaware that Katten's conduct was a wrongful *cause* of that injury until he deposed Mr. Hartz on November 16, 2017. This distinction, if valid, is critical to the timeliness of Andre's claims, as June 9, 2017, was more than two years before the filing of his complaint on June 27, 2019, but November 16, 2017, was less than two years before that date.

¶ 30 Katten's position is that, although Andre may not have been aware of the precise actions Katten's lawyers did or did not take to ascertain Ms. Newman's mental capacity, Andre's actions—both in petitioning to become Ms. Newman's temporary guardian to avoid further injury if Ms. Newman and Leonard retained control of her affairs and in calling Mr. Hartz to inform him of the appointment—indicate that he was on inquiry notice of his injury and that it was connected to Ms. Newman's May 2017 visits to Katten. We agree with Katten that on June 9, 2017, Andre knew of his injury and had reason to believe it was wrongfully caused by Leonard. Whether claims against Katten were within the scope of the reasonable inquiry triggered by that notice, however, is somewhat more nuanced.

¶ 31 The relevant cases lie along a spectrum. On one end of this spectrum is *Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, a case Katten relies on. The plaintiff in *Janousek* sued Katten for aiding and abetting his former business partners in breaches of their fiduciary duties. *Id.* ¶¶ 5-6. The plaintiff argued he was not on notice of the law firm's role in the breach until the business partners agreed to be deposed. *Id.* ¶ 18. The law firm, however, argued that the limitations period began running more than two years earlier, when the plaintiff wrote a letter to the business partners demanding that they compensate him for the harm they had caused him. *Id.* ¶ 4. This court concluded that the plaintiff's claims against the law firm were time-barred. *Id.* ¶¶ 17, 21. Although the plaintiff did not yet know the precise nature of the lawyers' role, he knew that they had been used by his business partners, and his claims against the lawyers for aiding and abetting the wrongdoing of the business partners were, in this court's view, "uniquely intertwined and inseparable" from claims against the former business partners that the plaintiff was certainly aware of more than two years before the suit was filed. *Id.* ¶¶ 21, 24.

¶ 32 At the other end of the spectrum is *Landreth v. Raymond P. Fabricius, P.C.*, 2018 IL App (3d) 150760, a case Andre relies on. In *Landreth*, the plaintiff was a contractor for a city government. *Id.* ¶ 5. Two years into the contract, the city stopped paying the plaintiff. *Id.* When the plaintiff sued the city for breach of contract four years later, he discovered that the city's position was that the agreement was void because it conflicted with the municipal code. *Id.* ¶ 6. The court held that there was a factual issue as to whether the plaintiff had any basis for inquiring, before the city raised that defense, whether he had a malpractice claim against the lawyer who drafted the agreement. *Id.* ¶¶ 37-38. Because it could reasonably have appeared, until the city raised its voidness defense, that the contract was valid and the city was simply breaching its contractual obligations, there may have been no reason to inquire into whether the agreement itself was problematic or the lawyer who drafted it had some liability. *Id.*

¶ 33 The facts presented here lie somewhere between these two ends of the spectrum. While in *Janousek* the third-parties' breaches of their fiduciary duties and the law firm's assistance in aiding and abetting those breaches were "uniquely intertwined and inseparable," here one

might argue that Leonard's conduct in orchestrating changes to Ms. Newman's will and Katten's alleged failure to assess her mental capacity to make those changes were distinct acts, such that a reasonable investigation into the one might not reveal the other. Until Mr. Hartz's deposition, it may reasonably have appeared to Andre that Katten had played, at most, an unwitting role in Leonard's scheme to isolate Ms. Newman, conceal her condition from those around her, and manipulate her to his own advantage. But the case is not as similar to *Landreth* as Andre would have us conclude. Andre knew that Leonard's wrongful conduct could not have been accomplished without Katten's assistance. The plaintiff in *Landreth*, conversely, had no reason to think that the city's conduct in breaching its contract had anything to do with its law firm's role in drafting it.

¶ 34    Whether claims against Katten fall within the scope of a reasonable inquiry triggered by facts known to Andre when he filed his guardianship petition is, in our view, a question of fact. The record presents starkly different descriptions of Ms. Newman's condition during the relevant period. Mr. Hartz described her in his deposition as lucid and capable of holding a conversation alone with him, answering his questions and articulating reasonable justifications for the proposed changes to her estate plan. Andre himself described her in his complaint as suffering only from the "early stages" of dementia. Andre's guardianship petition, however, describes someone with much more severe cognitive impairments manifesting themselves several months before the meetings with Mr. Hartz. If Ms. Newman's condition was not too severe, or if she still had both good and bad days, Andre may have had no reason to believe that Mr. Hartz (a lawyer he knew professionally) and Mr. Hartz's reputable law firm had failed to do anything it should have in connection with the matter. Andre believed that Leonard was isolating Ms. Newman and otherwise concealing the extent of her condition from those in a position to take notice of it, including perhaps the lawyers at Katten. And nothing in the record indicates that Katten had anything to gain by ignoring its duties to push through changes for what Mr. Hartz described as a "modest" estate.

¶ 35    The bottom line here is that Andre has not been deposed. What he knew of his mother's mental state at the time she visited Katten and whether he had any reason to suspect that the firm's lawyers failed to take reasonable steps to ascertain their elderly client's capacity before making significant changes to her recently modified estate plan are questions of fact and credibility that cannot be resolved on the record before us. At this juncture, we conclude that dismissal was improper because we are unable to say *as a matter of law* that claims against Katten were within the reasonable scope of Andre's inquiry notice.

¶ 36    Wholly irrelevant to this determination, we note, is our decision in *Mitsias v. I-Flow Corp.*, 2011 IL App (1st) 101126, which Andre relies on heavily, and in which we were asked to consider a very specific application of the discovery rule. In *Mitsias*, the plaintiff filed a medical malpractice complaint against a surgeon who had performed a procedure on her shoulder. *Id.* ¶ 2. At his deposition, the plaintiff's expert testified that newly published medical literature suggested a type of pain pump used in the surgery might have been the true cause of the plaintiff's injury. *Id.* In reliance on this information, the plaintiff added a products liability claim against the manufacturer of the pump to her case, which the circuit court dismissed as untimely. *Id.* ¶¶ 3-4. On appeal, we held that the plaintiff *could not* have been on notice or aware of the true cause of her injury—no matter the "exercise of diligent inquiry" she might have employed—because that cause was "yet unknown to science" when she filed her initial timely complaint. *Id.* ¶¶ 19, 31. Although the reasoning behind our holding in *Mitsias* may not

be strictly limited to the facts of that case (see *Guarantee Trust Life Insurance Co. v. Kribbs*, 2016 IL App (1st) 160672, ¶ 33 (noting this possibility)), it is clear to us that *Mitsias* does not apply here, where Katten's conduct, while not actually known by Andre, was certainly not unknowable in the same manner as the product defect in *Mitsias*.

¶ 37                                    B. Andre's Tolling Argument

¶ 38        With respect to counts I and III of the complaint, the claims for legal malpractice and unjust enrichment that Andre brought on his mother's behalf, he also argues that the two-year limitations period was tolled under an exception in the statute for minors and disabled persons. Subsection (e) of the statute provides: "If the person entitled to bring the action is under the age of majority or under other legal disability at the time the cause of action accrues, the period of limitations shall not begin to run until majority is attained or the disability is removed." 735 ILCS 5/13-214.3(e) (West 2016). Andre asserts that, under this provision, Ms. Newman's cognitive impairment was a disability that tolled the statutory limitations period for her claims.

¶ 39        Andre first raised this argument in his motion to reconsider. As an alternative ground for reversing the dismissal of two of his claims, it is therefore forfeited. See *Evanston Insurance*, 2014 IL 114271, ¶ 36 ("Arguments raised for the first time in a motion for reconsideration in the circuit court are forfeited on appeal."). Andre points out that we may overlook forfeiture. See *In re J.R.*, 342 Ill. App. 3d 310, 317 (2003) (noting that the rule "is an admonition to the parties and does not impose a limitation on the reviewing court"). Because we are reversing the dismissal of his complaint for a different reason—Katten's failure to establish *as a matter of law* that Andre was on inquiry notice to discover possible claims against it—we need not address the parties' arguments for and against forfeiture of the tolling argument.

¶ 40        We are still inclined, however, to address the underlying issue of the tolling provision's applicability. Not only has the question been fully briefed and argued in this court, but—with respect to the two claims (counts I and III) brought on behalf of Ms. Newman—it is likely to be raised again by Andre in response to Katten's continued assertion of the statute of limitations as an affirmative defense in this matter. See *Amalgamated Transit Union, Local 241 v. Illinois Labor Relations Board, Local Panel*, 2017 IL App (1st) 160999, ¶ 69 (examining, in the interest of judicial economy, an issue likely to reappear on remand).

¶ 41        Taking care not to violate court rules in the body of its brief, Katten nevertheless informs us in a footnote that its arguments against tolling "follow the thorough and persuasive reasoning presented in *Ross v. Stolberg*, 2018 IL App (1st) 180335-U," a "non-precedential Rule 23 order." There is, however, no exception to the supreme court rules for statements made only in footnotes. When Katten filed its brief, Illinois Supreme Court Rule 23(e) (eff. Apr. 1, 2018) clearly prohibited parties from citing nonprecedential orders as persuasive authority. Recent amendments to the rule relax this prohibition only for orders entered on or after January 1, 2021. Ill. S. Ct. R. 23(e) (eff. Jan. 1, 2021). Katten plainly should not have cited *Ross* and should refrain from relying on it on remand.

¶ 42        Nor are we persuaded that the reasoning Katten has adopted from that case is applicable here. Katten insists that at all relevant times Andre, who is not disabled, stood in his mother's shoes. The firm points out that, before the onset of her cognitive impairment, Ms. Newman granted Andre full power of attorney in the event that she became disabled. And Andre held that power of attorney at the time Katten argues a cause of action for legal malpractice or unjust enrichment would have arisen—in late May of 2017. According to Katten, it is Andre's

- 8 -

condition, and not Ms. Newman's, that is relevant to the timeliness of any claims brought by him on her behalf.

¶ 43 Katten acknowledges that an individual appointed as a guardian or conservator is not viewed as stepping so fully into the shoes of his or her principal that tolling based on the principal's disability is destroyed. The difference, it insists, is that the Illinois Power of Attorney Act, specifically provides that

> "[a]ll acts of the agent within the scope of the agency during any period of disability, incapacity or incompetency of the principal have the same effect and inure to the benefit of and bind the principal and his or her successors in interest as if the principal were competent and not a person with a disability." 735 ILCS 45/2-6(a) (West 2016).

At issue here, however, is not an affirmative *act* by Andre—he did not, for example, enter into a contract on his mother's behalf—but his *inaction* during the statutory limitations period. It is well established that courts are not at liberty to add words to a statute to change its meaning. *Wolf v. Toolie*, 2014 IL App (1st) 132243, ¶ 24. Rather, the language of the statute itself "is the best indication of the legislature's intent" and "must be given its plain and ordinary meaning." *Id.* ¶ 21.

¶ 44 Recognizing this, the *Ross* court looked to see whether the agent in that case had taken some affirmative action to bind her disabled principal. *Ross*, 2018 IL App (1st) 180335-U, ¶ 39. It found that she had—by retaining counsel during the limitations period to investigate and threaten, but not to file, claims against the defendant. *Id.* ¶¶ 36, 39. Here, by contrast, Andre took no action during the limitations period that would bind his mother and forfeit her right to a tolling of the statutory limitations period. To the extent that Katten is reading *Ross* to find that no affirmative act by an agent granted power of attorney is necessary to bind the agent's principal, that holding would appear to us to be contrary to the statutory language requiring "acts" of the agent. *Ross*, therefore, would not persuade us, even if Katten had properly cited it as persuasive authority.

¶ 45 In sum, Katten has made no compelling argument for why the statutory limitations period was not tolled under section 13-214.3(e) of the Code for claims brought on Ms. Newman's behalf that arose while she suffered from a disability.

¶ 46 IV. CONCLUSION

¶ 47 For the foregoing reasons, the judgment of the circuit court dismissing Andre's complaint with prejudice is reversed, and this cause is remanded for further proceedings consistent with this opinion.

¶ 48 Reversed and remanded.